# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Anna Vue Herr, *et al.*,

               Plaintiffs,          Civ. No. 09-2741 (RHK/FLN)
                                 **MEMORANDUM OPINION**
                                 **AND ORDER**

v.

Bill Peterson, *et al.*,

               Defendants.

---

Rockford R. Chrastil, Jonathan G. Steinberg, Chrastil and Steinberg, P.L.L.P., Minneapolis, Minnesota, for Plaintiffs.

Timothy S. Skarda, Minneapolis City Attorney's Office, Minneapolis, Minnesota, for Defendants.

---

## INTRODUCTION

On October 4, 2007, police officers executed a search warrant at the home of Anna and Leng Herr in Minneapolis. Two years later, the Herrs commenced the instant action, asserting ten claims against the officers involved in the search and their employers.[1] The case has narrowed substantially since it was commenced; remaining are claims of excessive force against certain Defendants. Those Defendants now move for summary judgment. For the reasons set forth below, the Court will grant their Motion.

---

[1] The Defendants fall into two groups: (1) the "County Defendants," namely, Hennepin County Sheriff's Deputies Terry Bean, Rick Palaia, Mary Jerde, Carrie Donarski, Jake Coopet, Brian Burds, and Brandy Sweitzer; Hennepin County; and the Metro Gang Strike Force; and (2) the "City Defendants," namely, Minneapolis Police Officers Bill Peterson, Carl Blad, Timothy Devick, John Sheneman, Griffin Hillbo, Jeffrey Kading, Mark Kaspszak, and Ricardo Muro; and the City of Minneapolis.

# BACKGROUND

The relevant facts are not in dispute or, where disputed, are recited below in the light most favorable to Herr.[2] See Graves v. Ark. Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000) (*per curiam*).

In late 2007, officers tasked to the Minnesota Gang Strike Force, a multi-agency police unit created to investigate and prosecute gang members, began looking into drug activity in the area around the 1200 block of Oliver Avenue North in Minneapolis. A confidential informant notified one of the officers, Hennepin County Sheriff's Deputy Terry Bean, that weapons and narcotics were being stored, packaged, and distributed from several houses on the block, which were purportedly under gang control. In particular, the informant told Deputy Bean that Asians "controlled 1218 Oliver and sold marijuana and guns" from that location. Deputy Bean, along with other Strike Force members, conducted surveillance in the area from September 25 to September 27, 2007, observing several hand-to-hand narcotics transactions, generally between 8:00 p.m. and midnight.

A short time later, Deputy Bean was advised by an informant, who had just been inside 1218 Oliver Avenue North, that the premises contained "a quantity of marijuana that was packaged and represented to be for sale by an Asian male. The [informant] said the male was armed with a handgun tucked into his waistband." Deputy Bean and the informant traveled to the home, where Deputy Bean observed several Asians coming and

---

[2] Because Leng Herr's claims are derivative (and duplicative) of those of Anna Herr, for ease of reference the Court refers to them collectively as "Herr."

going from the premises.  Deputy Bean checked computer records and discovered that

1218 Oliver Avenue North was owned by the Herrs and it "had [a] past weapons

complaint along with numerous other police contacts."  The informant, at Deputy Bean's

direction, then performed a "controlled buy" from the premises.  Deputy Bean observed

the informant meet an Asian male in front of the home.  The individual took money from

the informant, entered the premises, and returned a short time later with a package that

ultimately tested positive for marijuana.  The Asian male had a handgun tucked into his

waistband at the time of the controlled buy.

Based on the foregoing, Deputy Bean applied to a state-court judge for a search

warrant for the subject premises; he also sought permission to execute the warrant

unannounced, at night, to prevent the destruction of contraband and "to protect the safety

of the peace officers" executing the warrant.  The judge issued the warrant, authorizing

officers to search for, *inter alia*, drugs, drug money, "firearms, ammunition, and other

weapons to protect the narcotic sales operation."  The judge also authorized the warrant

to be executed at night in a "no-knock" fashion.  Because of the possibility of firearms in

the location and the fact that several other warrants would be executed on the same block

at the same time, the Minneapolis Police Department's ERU (SWAT) team was asked to

execute the warrant.

At approximately 9:30 p.m. on October 4, 2007, nine Minneapolis Police ERU

officers, dressed in tactical gear and some carrying automatic weapons, executed the

warrant.  They broke down the front door with a battering ram and, once inside,

immediately encountered three of Herr's children, aged 17, 14, and 12, watching

television in the living room. The officers trained their weapons on the children and ordered them to be quiet (using profanity), physically forced them onto the floor, and handcuffed them.[3]

Herr was in her bedroom on the home's main level with her 8-year-old son when the officers entered the premises. Upon hearing the commotion, she opened the door to her bedroom and began to step into the hallway, at which point she observed the officers. Before she could say anything, an officer grabbed her and threw her to the ground; according to Herr, the officer then kicked her twice in the side and put his foot on her neck. The officer climbed on top of her, placing his knee into her back, pulled her hands roughly behind her, handcuffed her tightly, and dragged her down the hallway into the living room, where officers remained with her other children.[4]

The officers then proceeded through the remainder of the house, encountering an adult male, two juvenile females, and a child at the top of a staircase leading to the second floor. These individuals also were brought down to the living room. No other persons were found on the premises. With the location secure, the ERU officers exited, turning the scene over to Strike Force officers who conducted a search and questioned the occupants. The ERU officers were inside the house for a total of approximately seven minutes. Ultimately, nothing illegal was found and no one was arrested.

---

[3] Herr also alleges that the officers placed towels and/or sheets over the heads of her children (see Mem. in Opp'n at 4), although she does not rely upon this allegation to support her claims (see id. at 14-29).

[4] To be precise, the officers used plastic zip ties, not metal handcuffs, when securing Herr and her children, but for ease of reference the Court refers to them as handcuffs.

Herr told the Strike Force officers that the ERU officers had injured her by throwing her to the floor, kicking her, and pulling her arms behind her back. Leng Herr, who was not home at the time of the raid, arrived shortly after the police had left and observed that his wife was injured. He called an ambulance, but the responding medical personnel determined that Herr was not in need of emergency assistance. Later that evening, when she did not improve, Leng Herr took his wife to the emergency room. There, she complained of pain in her ribs where she had been kicked and in her left shoulder and neck from the forceful handcuffing and being dragged down the hallway. A chest x-ray revealed no rib fracture or pneumothorax (collapsed lung). The emergency-room doctor concluded that she had "sustained contusions to her ribs and sprain of her neck and left shoulder" and discharged her with a prescription pain-killer. She missed two days of work due to these injuries.

Since the incident, Herr has received continuing medical treatment for neck and back pain as a result of being handcuffed and dragged down the hall. The reports of her physicians do not indicate any ongoing problems relating to the kicks she received in her side, although in her September 17, 2010 deposition she complained that the area remains painful. She also complains of emotional distress related to the incident.

In October 2009, Herr commenced the instant action on behalf of herself and three of her children, asserting 10 claims against the City Defendants and the County Defendants; she subsequently settled her claims against the County Defendants. The City Defendants now move for summary judgment, arguing that they are entitled to qualified immunity of Herr's claims. In response, Herr has agreed to dismiss seven counts in her

Complaint. (See Mem. in Opp'n at 3 & n.1.)[5] Remaining are (1) Count I, which alleges that the City Defendants' conduct violated the Fourth and Fourteenth Amendments to the United States Constitution; (2) Count III, which alleges that the City Defendants' conduct violated 42 U.S.C. § 1983; and (3) Count IV, which alleges that the City Defendants allowed one another to violate Herr's constitutional rights and failed to take steps to stop the allegedly unlawful conduct. The Motion has been fully briefed and is now ripe for disposition.

## STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The moving party bears the burden of showing that the material facts in the case are undisputed. Id. at 322; Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000). The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. Graves, 229 F.3d at 723; Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

---

[5] Those Counts alleged equal-protection violations and claims under state tort law.

## ANALYSIS

Before analyzing Herr's claims, it is important to understand what remains in this case: Count I, which asserts that Defendants violated the Fourth and Fourteenth Amendments due to "unreasonable searches" and "unreasonable seizures" (Compl. ¶ 30); Count III, which asserts that Defendants violated 42 U.S.C. § 1983 due to the use of excessive force, "violations of due process, deprivation of liberty rights and interests, and the right to equal protection of the laws" (Compl. ¶ 33); and Count IV, which asserts that each Defendant violated 42 U.S.C. § 1983 by failing to prevent the constitutional violations of the other Defendants (Compl. ¶ 34). While these claims appear to implicate a broad swath of constitutional issues, both Herr's brief and her arguments at the November 9, 2010 Motion hearing make clear that she is asserting at this juncture only claims of excessive force under the Fourth Amendment. Her Memorandum in Opposition repeatedly suggests that the sole dispositive question is whether the force used by the officers exceeded the quantum permissible under the Fourth Amendment. (See id. at 2-3 ("There are few excessive force cases in which summary judgment is appropriate. This is not one of them.") (internal citation omitted); id. at 14 ("In evaluating a Fourth Amendment excessive force claim . . . ."); id. at 29 ("In this case, it is clear that the individual City Defendants used unreasonable force against Plaintiff Anna Herr, and minor Plaintiffs A.H., N.H., and C.H., thereby violating their civil rights.").) She echoed that sentiment at oral argument, in which she called the officers' use of force "the nut of the case."

When focused through this lens, the scope of Herr's claims becomes clearer. Count I asserts only an excessive-force claim under the Fourth Amendment. Count III asserts the same claim under 42 U.S.C. § 1983 and is, therefore, duplicative of Count I.[6] And Count IV asserts that each individual Defendant failed to prevent the remaining individual Defendants from using excessive force, and hence it is derivative of Counts I and III. It is also clear that Herr is pressing her claims solely against the individual City Defendants, not the City itself, and only in their individual capacities. (See Mem. in Opp'n at 29.)[7] The Court's analysis, therefore, is limited to whether the individual City Defendants used excessive force.

I.      **Qualified immunity**

To determine whether the City Defendants are entitled to qualified immunity on Herr's claims, the Court must answer two questions. First, do the facts alleged, when viewed in the light most favorable to Herr, show that the challenged conduct violated a

---

[6] Section 1983 was designed to provide an avenue of relief for persons aggrieved by constitutional violations. See, e.g., Goss v. City of Little Rock, Ark., 151 F.3d 861, 864 (8th Cir. 1998) ("[Section] 1983 does not create substantive rights that a person can 'enforce' in the typical sense of the word. Instead [it] establishes a means by which people can enforce the Constitution. It simply provides that, when a state actor violates a person's constitutional rights, that person can sue the state actor.") (citation omitted). In other words, Section 1983 (Count III) provides the vehicle through which Herr can attempt to vindicate her Fourth-Amendment rights (Count I).

[7] In any event, for the City to be liable here, Herr must proffer evidence that the complained-of conduct resulted from an unconstitutional policy or custom. Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 694 (1978); Nix v. Norman, 879 F.2d 429, 433 (8th Cir. 1989). She has proffered no such evidence, mandating the City's dismissal. The same logic applies to the claims against the individual City Defendants in their official capacities. See Kentucky v. Graham, 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.").

constitutional right?  If so, was the constitutional right at issue clearly established on the date in question?  E.g., Avalos v. City of Glenwood, 382 F.3d 792, 798 (8th Cir. 2004).[8]

**A.    Violation of a constitutional right**

**1.    Fourth-Amendment considerations**

The constitutional right at issue here is the right to be free from excessive force.  It is beyond peradventure that the Fourth Amendment precludes the use of excessive force by law-enforcement officers.  E.g., Andrews v. Fuoss, 417 F.3d 813, 818 (8th Cir. 2005).  The question to be answered is whether the force here exceeded that constitutionally permissible.

In Michigan v. Summers, the Supreme Court recognized that police officers executing a valid search warrant enjoy the right to "detain the occupants of the premises while a proper search is conducted."  452 U.S. 692, 705 (1981); accord, e.g., Lykken v. Brady, __ F.3d __, 2010 WL 3632754, at *4 (8th Cir. Sept. 21, 2010).  That right necessarily carries with it the authority to use a reasonable amount of force to effectuate the detention.  Muehler v. Mena, 544 U.S. 93, 98-99 (2005) ("Inherent in Summers' authorization to detain an occupant of the place to be searched is the authority to use reasonable force to effectuate the detention."); Lykken, 2010 WL 3632754, at *5 ("Mena expressly allows the use of force to carry out a Summers detention.").  In addition, when "executing a search warrant[,] officers may take reasonable action to secure the premises

---

[8] In Pearson v. Callahan, 129 S. Ct. 808, 818 (2009), the Supreme Court held that this two-step inquiry, which emanated from the seminal case of Saucier v. Katz, 533 U.S. 194 (2001), is "no longer . . . mandatory."  Under Pearson, courts are now free (but not required) to skip the first step and proceed directly to whether the constitutional right at issue was clearly established when the alleged violation occurred.  Id.

and to ensure their own safety and the efficacy of the search." L.A. Cnty., Cal. v. Rettele, 550 U.S. 609, 614 (2007) (*per curiam*).

In deciding whether the amount of force used by a police officer was constitutionally excessive, the Court must apply an "objective reasonableness" standard. Graham v. Connor, 490 U.S. 386, 392 (1989); Samuelson v. City of New Ulm, 455 F.3d 871, 875 (8th Cir. 2006). Under that standard, the Court must evaluate the facts and circumstances surrounding the use of force, "including the severity of the crime at issue, whether the [plaintiff] pose[d] an immediate threat to the safety of the officers or others, and whether [the plaintiff] . . . actively resist[ed] arrest or attempt[ed] to evade arrest by flight." Samuelson, 455 F.3d at 875 (internal quotation marks and citation omitted). Put another way, whether the force used was reasonable under the Fourth Amendment requires a court to "evaluate the totality of the circumstances," attempting to "careful[ly] balanc[e] . . . the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Copeland v. Locke, 613 F.3d 875, 881 (8th Cir. 2010) (citations omitted). The Court's inquiry is an objective one, "without regard to [the officers'] underlying intent or motivation." Samuelson, 455 F.3d at 875-76 (citation omitted). In undertaking its analysis, the Court must be mindful that "officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary." Graham, 490 U.S. at 397.

## 2. The Fourth Amendment applied in this case

The facts of this case are undoubtedly unfortunate. Officers broke into Herr's home as she was preparing for bed, pointed weapons at her and her children, forcefully took her to the ground and handcuffed her and then dragged her down a hallway, and yet they found no evidence of illegal activity. As the Supreme Court has recognized, however, "[v]alid warrants will issue to search the innocent, and people like [Herr] unfortunately bear the cost." Rettele, 550 U.S. at 616. Even viewing the record in the light most favorable to Herr, the Court concludes that she has proffered insufficient evidence to create a triable issue regarding the officers' conduct.

Most critical to the Court's analysis – and largely ignored by Herr – is the search warrant. Herr does not dispute that the warrant was valid. The Court, therefore, must proceed on the assumption that there was probable cause to believe officers would find the tools of the narcotics trade, including "firearms, ammunition, and other weapons to protect the narcotic sales operation," inside Herr's home. Indeed, a confidential informant had told Deputy Bean that there were firearms in the house, and he observed at least one Asian male conducting a drug transaction with a firearm in his waistband.

These facts are crucial. "[T]he execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence," Summers, 452 U.S. at 702, particularly where, as here, officers are aware that guns may be found in the location being searched.[9] When executing a high-risk warrant, "[t]he risk of harm to both the

---

[9] At oral argument, Herr asserted that there was a dearth of evidence indicating that the City Defendants were aware firearms might be found in the house. But the mere fact that Deputy

police and the occupants is minimized if the officers . . . exercise unquestioned command of the situation." Id. at 702-03. Hence, in the Court's view, it was not improper for officers to take Herr to the ground and immediately handcuff her, nor was it improper for them to quickly drag her down the hallway into the living room – a room they had already secured – while continuing their search of the premises. E.g., Scott v. Dist. of Columbia, 101 F.3d 748, 759 (D.C. Cir. 1996) (finding no excessive force by police officers who, inter alia, dragged handcuffed plaintiff to police vehicle, since officers were "in a quickly developing situation" where they believed suspect was attempting to flee); Hutchinson v. W. Va. State Police, __ F. Supp. 2d __, 2010 WL 3069683, at *18 (S.D.W. Va. Aug. 5, 2010) (granting summary judgment to officers on excessive-force claim where they dragged plaintiff by her hair out of shower and into living room to be placed, naked, with house's remaining occupants); Sephers v. Dias, No. C 06-1593, 2007 WL 420255, at *4 (N.D. Cal. Feb. 5, 2007) (rejecting contention that officers used excessive force by dragging handcuffed suspect by his arms). The officers needed "to secure the [location] and ensure other persons were not close by [and] did not present a danger." Rettele, 550 U.S. at 615. It would have been unreasonable to expect them, while "entertaining what they believe[d] to be a high risk situation, to spend the time necessary to determine whether [an occupant] was a threat" before taking action to protect themselves. Muehler, 544 U.S. at 109 (Stevens, J., concurring).

---

Bean sought ERU assistance in executing the warrant belies that assertion. Moreover, there exists ample, uncontradicted evidence in the record indicating that the ERU officers were informed of the dangerous nature of the warrant and that they might encounter firearms. (See Skarda Aff. Exs. 10-11; Bean Dep. Tr. at 94-97; Peterson Dep. Tr. at 16-17.)

The same is true of the officers' actions in handcuffing Herr. Although they forcefully yanked her hands behind her back in order to apply the handcuffs, given the "tense, uncertain, and rapidly evolving situation," Graham, 490 U.S. at 397, it was not improper for them to do so, in this Court's view, in order to secure her (and the scene) as quickly as possible. See, e.g., Rodriguez v. Farrell, 280 F.3d 1341, 1351 (11th Cir. 2002) (no excessive force where officer "grabbed plaintiff's arm, twisted it around plaintiff's back, jerk[ed] it up high to the shoulder and then handcuffed plaintiff as plaintiff fell to his knees screaming that [the officer] was hurting him," even though resulting injuries ultimately caused partial amputation of plaintiff's arm); Sephers, 2007 WL 420255, at *4; Schultz v. Hall, 365 F. Supp. 2d 1218, 1228-31 (N.D. Fla. 2005) (no excessive force where officers yanked plaintiff's arms so forcefully while handcuffing her that they caused a hairline fracture of her humerus bone). While the officers could have proceeded more gingerly, the reasonableness of the force employed must be judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396. Indeed, the reasonableness of the officers' conduct "does not necessarily or invariably turn on the existence of alternative or 'less intrusive' means." Illinois v. Lafayette, 462 U.S. 640, 647 (1983).

This case is similar to others in this district and elsewhere involving high-risk search warrants. For instance, in Cook v. City of Minneapolis, Civ. No. 06-2579, 2007 WL 1576122 (D. Minn. May 31, 2007) (Frank, J.), officers executing a search warrant for an armed-robbery suspect encountered the suspect's 72-year-old diabetic grandfather coming down a staircase. The officers grabbed the man and shoved him to the ground,

placed a foot on his side, and held him down at gunpoint before completing their search of the premises.  Id. at *2.  Cook held that based upon these facts, no reasonable jury could conclude that the officers had used excessive force.  Id. at *5-6.  Similarly, in Hutchinson, police officers executed a warrant at a home associated with violent individuals, the manufacture of narcotics, and firearms.  While "clearing" the residence, they encountered the plaintiff as she was exiting the shower.  The officers screamed expletives at her, pushed her head down, and forcefully pulled her to the living room, unclothed, by her hair.  Considering the circumstances surrounding the search warrant, Hutchinson concluded that "it was not unreasonable for [the officers] to forcibly, even roughly, remove [the plaintiff] from the bathroom."  2010 WL 3069683, at *18.  And in Tolliver v. Baxter County, Arkansas, No. 05-3036, 2006 WL 2032647 (W.D. Ark. July 18, 2006), SWAT officers executing a search warrant for narcotics encountered several people who they threw to the ground and handcuffed; the officers also pointed firearms at them.  Tolliver held that these facts were insufficient to constitute excessive force, "[g]iven the safety concerns the officers faced in executing the search warrant."  Id. at *8. As in these cases, when viewing the totality of the circumstances here, the undersigned does not believe that the officers exceeded their lawful authority by forcing Herr to the ground, pointing weapons at her, handcuffing her, and dragging her down the hallway.[10]

Herr makes much of the fact that "the warrant being executed was a search warrant, not an arrest warrant," and that none of the occupants resisted or attempted to

---

[10] Herr cites this Court's decision in Hagen v. Palmer, Civ. No. 02-4318, 2003 WL 22136067 (D. Minn. Sept. 12, 2003) (Kyle, J.), to support her claims, but that case is distinguishable.  Hagen did not involve the execution of a search warrant for narcotics, nor were firearms involved.

flee.  (Mem. in Opp'n at 17-22.)  But that assertion ignores the dangers inherent in the type of warrant being executed.  While the individuals the officers encountered – Herr's children and, later, Herr herself – did not resist, the officers had no way of knowing whether an armed occupant would suddenly appear and open fire on them.  Indeed, *after* securing Herr and her children, officers encountered additional persons on the second floor of the premises.  As Justice (then-Judge) Alito once observed, police officers are not "required to banish all fear" if, upon executing a search warrant, they encounter "a pastoral scene of several people sitting peaceably in a parlor."  Mellott v. Heemer, 161 F.3d 117, 124 (3d Cir. 1998).  Given the facts here, a reasonable officer "could have feared that firearms might be hidden and that the individuals [they encountered] . . . might have tried to obtain access to them.  A reasonable officer also could have feared that other persons might be in other rooms in the house."  Id.

Herr's arguments are similar to those considered and rejected by the Supreme Court in Rettele.  There, officers executing a search warrant forced the plaintiffs from their bed, at gunpoint, and ordered them to stand naked in front of the officers for several minutes, with weapons trained on them, while other officers conducted a search of their home.  The warrant in Rettele concerned an identity-theft ring, a crime with far fewer implications for violence than the narcotics crime at issue here.  The plaintiffs offered no resistance to the officers.  Nevertheless, the Supreme Court held that the plaintiffs had not proved a Fourth-Amendment violation, because the officers were justified in their actions "to protect the[ir] safety" and minimize the risk of harm to themselves and anyone else on the premises.  550 U.S. at 614-15.  The same is true here.

Although the Court finds nothing unlawful in the officers taking Herr down, handcuffing her, and dragging her to the living room, the assertion that an (unspecified) officer kicked her twice in the side is troubling. As noted in <u>Cook</u>, "it should be a rare case in which an officer must resort to kicking people – particularly unarmed . . . people." 2007 WL 1576122, at *6. Nor is there any obvious explanation for the kicking – a fact Defendants acknowledge. (<u>See</u> Def. Mem. at 22 ("[T]he alleged kick to Ms. Herr's side cannot be explained by the Defendants.").)

Nevertheless, the Court concludes that the kicking, assuming it occurred, is an insufficient basis for Herr's excessive-force claim. The Eighth Circuit has repeatedly held that "a <i>de minimis</i> . . . injury is insufficient to support a finding of a constitutional violation." <u>Andrews</u>, 417 F.3d at 818; <u>accord</u> <u>Crumley v. City of St. Paul</u>, 324 F.3d 1003, 1007 (8th Cir. 2005). "[N]ot every push or shove by an officer violates the Fourth Amendment." <u>Andrews</u>, 417 F.3d at 818. In <u>Andrews</u>, the defendant hit the plaintiff in the shoulder with a "forceful blow" that was strong enough to make the plaintiff "see stars." 417 F.3d at 815. As a result, the plaintiff suffered from a sore neck, a "horrible, horrible headache," and a painful flare-up of pre-existing back injuries. <u>Id.</u> The Eighth Circuit held that these injuries were insufficient to make out an excessive-force claim. <u>Id.</u> at 818.

Here, the kicks Herr sustained caused pain in her side; although she claimed in her deposition that the pain still exists today, her counsel acknowledged at oral argument that she had fully healed from the kicks. The emergency-room report from the date in question contains no indication of a rib fracture or pneumothorax, and reports from her

current doctors do not suggest (or even mention) any ongoing problems specifically related to the kicks. Given these facts, and in the absence of evidence of some type of permanent injury directly related to the kicks, the Court finds that the injuries Herr sustained are an insufficient basis, under Eighth-Circuit precedent, upon which to predicate a Fourth-Amendment claim. See, e.g., Wertish v. Krueger, 433 F.3d 1062, 1067 (8th Cir. 2006) ("[R]elatively minor scrapes and bruises and the less-than-permanent aggravation of a prior shoulder condition were *de minimis* injuries that support a conclusion that [the defendant] did not use excessive force."); Andrews, 417 F.3d at 815; Foster v. Metro. Airports Comm'n, 914 F.2d 1076, 1082 (8th Cir. 1990) ("allegations of pain as a result of being handcuffed, without some evidence of more permanent injury," are insufficient to support an excessive-force claim; plaintiff's claim of "nerve damage" did not suffice absent "medical records indicating . . . any long-term injury as a result of the handcuffs").

To be clear, the Court does not condone the officers kicking Herr (assuming that kicking occurred). Rather, the Court concludes that such kicking is not actionable in the absence of injury more significant than that she allegedly sustained.[11]

Finally, the Court must address the claims that Herr brings on behalf of her children. She argues that by training their weapons at the children and shouting expletives at them, the officers used excessive force. However, there is no *per se* rule

---

[11] The Court notes that Herr also complains of emotional distress, but that appears related to "the fact that the warrant was issued and executed at all" rather than "the quantum of force used in the execution of the warrant." Hunter v. Namanny, 219 F.3d 825, 832 (8th Cir. 2000). The alleged emotional distress, therefore, does not alter the Court's analysis.

prohibiting police officers from pointing weapons at children.  See, e.g., Taft v. Vines, 83 F.3d 681, 684 (4th Cir. 1996) (*en banc*) (granting qualified immunity to officers who pointed weapons at children aged 10 to 16); Pina v. City of Hartford, Civ. A. No. 07-0657, 2009 WL 1231986, at *7-8 (D. Conn. Apr. 29, 2009); Murray *ex rel.* Morrow v. Metro. Gov't of Nashville, No. 3:06-0570, 2007 WL 1521004, at *6-7 (M.D. Tenn. May 21, 2007); Hawkins v. United States, No. EP-93-CA-193-H, 1994 WL 802850, at *3 (W.D. Tex. Nov. 29, 1994).  In the absence of Eighth-Circuit precedent to the contrary (which Herr has not cited) or special circumstances, such as a child being of a particularly young age, the Court believes that an excessive-force claim asserted by (or on behalf of) a child should be analyzed in the same fashion as a claim asserted by an adult.  The focus must be on the "totality of the circumstances," of which the age of the person subjected to the force is but one factor.  Copeland, 613 F.3d at 881.

For this reason, the claims brought on behalf of Herr's children fail.  As discussed above, the officers here were executing a high-risk warrant for narcotics and firearms. They were justified in entering the home with weapons drawn and pointing them at the first persons they encountered, not knowing whether those individuals posed a threat to their safety.  In the Court's view, it makes no difference that these individuals were aged 17, 14, and 12, rather than adults; certainly children of such ages are capable of using firearms.[12]  And the use of profanity by the officers, while "offensive and

_____

[12] Notably, the officers did *not* point their weapons at (or handcuff) Herr's 8-year-old son, who was standing next to her when the officers took her to the ground, or the young child they encountered at the top of the stairs.  (See Herr Aff. ¶¶ 3-4.)

unprofessional," <u>Cook</u>, 2007 WL 1576122, at *5, adds nothing to the excessive-force

analysis.  <u>See, e.g.</u>, <u>Pina</u>, 2009 WL 1231986, at *8; <u>but see</u> <u>Holland</u> *ex rel.* <u>Overdorff v.</u>

<u>Harrington</u>, 268 F.3d 1179, 1194 (10th Cir. 2001) (noting that foul language may be

"sufficient to tip the scales in a close case").[13]

Herr relies heavily upon <u>Holland</u> to support the claims brought on behalf of her

children.  <u>Holland</u> acknowledged that it is "not unreasonable for officers to carry

weapons [while executing a warrant] or to take control of a situation by displaying their

weapons," but nevertheless affirmed the denial of qualified immunity to SWAT officers

executing a search warrant because they pointed weapons "at young children" and

shouted expletives at them.  <u>Id.</u> at 1183-84, 1193.  In the Court's view, <u>Holland</u> is

distinguishable for several reasons.

First, <u>Holland</u> found that "the SWAT Team's initial show of force may have been

reasonable under the circumstances," but ripened into a constitutional violation after the

officers "continu[ed] to hold the children directly at gunpoint *after the officers had*

*gained complete control of the situation*."  <u>Id.</u> at 1193 (emphasis added).  No similar facts

exist here; indeed, upon securing Herr's residence, the individual City Defendants exited

the home entirely.  Second, <u>Holland</u> did not involve allegations of firearms in the

plaintiff's home, and as noted above the children here are significantly older than the

children in <u>Holland</u>.  Without drawing a bright-line rule, it seems apparent to the Court

that a 17-year-old (or a 14-year-old or 12-year-old) child poses a much greater threat to

---

[13] The Court's analysis assumes *arguendo* that pointing a weapon at a child is sufficient to
constitute a Fourth-Amendment "seizure" – a proposition not entirely free from doubt, <u>see</u>
<u>Edwards v. Giles</u>, 51 F.3d 155, 157 (8th Cir. 1995) – because the claims nevertheless fail.

police officers than does an 8-year-old or (especially) a 4-year-old, as in <u>Holland</u>. Third, and finally, the children in <u>Holland</u> were not located inside the home when the warrant was executed; all were found outside, including one who was playing basketball in the driveway. The prospect of threat or interference by the children, therefore, was significantly lower than in this case.

For all of these reasons, the Court concludes that Herr has failed to establish a violation of the Fourth Amendment. Accordingly, the individual City Defendants are entitled to qualified immunity on her claims. <u>Avalos</u>, 382 F.3d at 798.

## B. Clearly established

Because Herr has failed to establish a constitutional violation, "there is no necessity for further inquiries concerning qualified immunity." <u>Rettele</u>, 550 U.S. at 616 (citation omitted). Nevertheless, the Court concludes that even if Herr had made out a constitutional violation, her claims would still be subject to dismissal because she has failed to show that the rights violated were clearly established on the date in question.

"The generalized right to be free from an unreasonable use of excessive force during a police seizure does not clearly establish a right for purposes of a qualified-immunity analysis." <u>Mettler v. Whitledge</u>, 165 F.3d 1197, 1202-03 (8th Cir. 1999) (citation omitted). Rather, a plaintiff must show that the right at issue was clearly established "*in a particularized sense relevant to the case at hand*." <u>Id.</u> at 1203 (emphasis added). This requires proof of pre-existing case law with sufficiently analogous facts to make it clear to a reasonable police officer that his conduct is unlawful. <u>E.g.</u>, <u>Littrell v. Franklin</u>, 388 F.3d 578, 583 (8th Cir. 2004); <u>Meloy v.</u>

<u>Bachmeier</u>, 302 F.3d 845, 848 (8th Cir. 2002) ("Although earlier cases need not involve fundamentally or materially similar facts, the earlier cases must give officials fair warning that their alleged treatment of [the plaintiff] was unconstitutional.").

<u>Rettele</u>, <u>Muehler</u>, and <u>Summers</u>, each of which predated the incident here, undermine the contention that the force used in this case was excessive.[14]  The Court simply cannot conclude that reasonable officers "would have known [that the] conduct [at issue here] was unconstitutional."  <u>Vaughn v. Ruoff</u>, 253 F.3d 1124, 1130 (8th Cir. 2001).

## CONCLUSION

The Court is not unsympathetic to the fear that Herr and her children undoubtedly experienced when officers raided her house.  Nevertheless, the facts of this case do not establish a constitutional violation.  Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that the City Defendants' Motion for Summary Judgment (Doc. No. 17) is **GRANTED** and Plaintiffs' claims against these Defendants are **DISMISSED WITH PREJUDICE**.  As these are the only claims left in this case, **LET JUDGMENT BE ENTERED ACCORDINGLY**.


Date:  November 16, 2010                          s/Richard H. Kyle
                                                  RICHARD H. KYLE
                                                  United States District Judge

---

[14] Notably, <u>Rettele</u> was decided approximately four months before the raid on Herr's home.